1
2
3
4
5
6               UNITED STATES DISTRICT COURT

7                     DISTRICT OF NEVADA

8                           * * *

9   USF INSURANCE COMPANY, a Michigan    Case No. 2:10-cv-01513-MMD-VCF
    corporation,
10
                              Plaintiff,              ORDER
11          v.

12  SMITH'S FOOD AND DRUG CENTER,
    INC.; d/b/a SMITH'S FOOD AND DRUG
13  CENTER, #377, an Ohio corporation, and
    J&I MAINTENANCE, a Utah corporation,
14
                              Defendants.
15

16  SMITH'S FOOD AND DRUG CENTER,
    INC. d/b/a SMITH'S FOOD AND DRUG
17  CENTER, #377, an Ohio corporation,

18                          Counterclaimant,

19          v.

20  USF INSURANCE COMPANY, a
    Michigan corporation; and ROE
21  CORPORATIONS I-X, inclusive,

22                        Counterdefendants.

23

24  I.    SUMMARY

25          Before the Court are three competing summary judgment motions filed by Plaintiff

26  USF  Insurance  Company  ("USF")  and  Defendant  Smith's  Food  &  Drug  Centers,  Inc.

27  ("Smith's").  (Dkt. nos. 61, 63, and 84.)  At stake is the resolution of USF's claims and

28  Smith's' counterclaims arising out of an insurance dispute.  The Court has reviewed the

1  briefings in these motions, and makes its rulings in accordance with the reasoning set

2  forth below.

3  **II.     BACKGROUND**

4        **A.     The Insurance Contracts**

5        J&I Maintenance ("J&I") is in the business of providing janitorial and cleaning

6  services to its clients.  On January 19, 2004, Smith's, a national grocery store operator,

7  entered into a one-year Maintenance Agreement ("Agreement") in which J&I agreed to

8  perform daily cleaning and maintenance at various Smith's stores.  The Agreement

9  obligated J&I to defend, indemnify, and hold Smith's harmless from all claims, losses,

10  expenses, and liability resulting from J&I's cleaning and maintenance.  The Agreement

11  also required J&I to maintain comprehensive liability insurance with a minimum

12  aggregate coverage of $2,000,000 under which Smith's was to be designated as an

13  additional named insured.

14        J&I was insured under a comprehensive commercial general liability policy ("the

15  Policy") through USF with a general aggregate liability limit of $2,000,000 and a personal

16  injury limit of $1,000,000.  USF agreed to defend and indemnify J&I against all claims of

17  bodily injury that J&I becomes legally obligated to pay.  The Policy also stated that USF

18  agreed to defend and indemnify all "additional insureds."

19        On May 25, 2006, Smith's and J&I extended the terms of the Agreement for an

20  additional year.

21        **B.     The Bell Litigation**

22        In February 2007, Tammy Bell filed suit against Smith's and J&I for injuries

23  resulting from an alleged slip and fall that occurred at a Smith's location.  On February

24  26, 2008, Smith's' counsel, Mr. Jerry Busby, tendered the defense of the Bell litigation to

25  J&I and demanded that Smith's be defended and indemnified from all liability pursuant to

26  the Agreement. (Dkt. no. 61-B.)  USF alleges that J&I never accepted the tender.

27  Instead, the attorney USF had authorized to represent J&I, John Shannon,

28  misrepresented to USF that J&I did in fact accept Smith's' tender.  USF alleges that as a

1    result of this misrepresentation, USF authorized Mr. Shannon to also defend Smith's in

2    the action on July 15, 2008.  (Dkt. no. 68-E.)

3         On July 2, 2008, Mr. Shannon sent USF an initial suit report detailing the facts of

4    the case, his assessment of J&I's liability, and an estimated damages exposure in light

5    of Ms. Bell's surgery.  (Dkt. no. 84-O.)  At the time the report was prepared, Ms. Bell's

6    deposition had not been taken, and various medical records relating to an upcoming

7    spinal fusion surgery as well as earlier medical procedures pre-dating the accident were

8    unavailable.  Nevertheless, Mr. Shannon assessed J&I's liability at 100% based on the

9    testimony of various witnesses.  Mr. Shannon noted that he could not assess J&I's

10   potential exposure in light of the missing medical evidence, but approximated it to be

11   roughly $200,000.

12        Smith's alleges that Mr. Shannon took Ms. Bell's deposition on September 18,

13   2008, where he learned that Ms. Bell had undergone a failed back fusion surgery before

14   her deposition.  Smith's alleges that it was never informed of Bell's deposition or alleged

15   injuries, or that her medical bills had risen to over $200,000.

16        On November 24, 2008, Ms. Bell's counsel served an Offer of Judgment seeking

17   to settle the litigation for $999,999.99 ("the Offer"). (Dkt. no. 68-F.)  Smith's alleges that it

18   was not apprised of this offer during the acceptance period.   Having received no

19   response from J&I, Ms. Bell's counsel wrote Mr. Busby on December 17, 2008,

20   extending the deadline to respond to the Offer and noting that J&I's failure to respond

21   may constitute bad faith on the part of J&I's insurer.  (Dkt. no. 68-G.)  In the meantime,

22   and after having received the Offer which USF had rejected, Mr. Shannon wrote to USF

23   on December 22, 2008, recommending that USF revisit its previous denial of the Offer

24   and to accept Ms. Bell's Offer in light of the documented medical damages suffered by

25   Ms. Bell.  (Dkt. no. 68-I.)

26        Having not received a response to the Offer or a response to a phone call, Ms.

27   Bell's counsel wrote to Mr. Shannon on December 29, 2008, to extend the deadline for

28   J&I's response to the Offer.  (Dkt. no. 68-H.)  The offer ultimately lapsed.

On April 27, 2009, mediation in the Bell litigation failed to settle the dispute.  After its completion, Mr. Busby wrote Mr. Shannon and J&I on April 29, 2009, on behalf of Smith's, expressing his disapproval of J&I's failure to settle the litigation.  (Dkt. no. 68-J.)  Mr. Busby described the mediation as a failure, and noted his frustration that J&I countered Ms. Bell's offer of a $3.75 million settlement with only a $100,000 offer.  In light of the failure, Mr. Busby concluded that "[t]he decision made by either J&I or their insurance carrier to risk a verdict over policy limits appears to have been made in bad faith," and reserved his client's rights to pursue a claim against J&I and USF.  (*Id.* at 2.)

On November 19, 2009, Mr. Busby wrote Mr. Shannon, USF, and J&I demanding that USF provide separate counsel for Smith's and that USF settle the litigation above its policy limits and incur all of the resulting costs.  (Dkt. no. 68-K.)

In response to the November 19, 2009, letter, Sally Rock, Liability Claims Examiner for USF, wrote Mr. Busby on December 22, 2009, to explain USF's decision not to settle.  (Dkt. no. 68-L.)  She explained that USF's failure to respond to Ms. Bell's offer was due to not having all of Ms. Bell's medical records to evaluate her claims, and that USF's failure to resolve the dispute during mediation was due to Ms. Bell's surprise request for settlement above the policy limit.  Ms. Rock concluded the letter by informing Mr. Busby that USF's duty to defend and indemnify Smith's depends on the terms of USF's policy with J&I, and that this policy does not permit Smith's to choose its own counsel.  Ms. Rock again refused to appoint independent counsel as documented in a March 15, 2010, letter.  (Dkt. no. 84-M.)

On May 7, 2010, Mr. Busby wrote to Ms. Rock concerning Smith's and J&I's liability in the underlying Bell litigation.  (Dkt. no. 6-L.)  In this letter, Mr. Busby recounted a March 25, 2010, status report prepared by Mr. Shannon in which Mr. Shannon noted that a conflict of interest existed between J&I and Smith's, that sufficient evidence existed for J&I to be found liable for causing the accident, and that he valued the exposure in the case to be between $6 to $10 million.  (*Id.*)

///

4

1    Thereafter, Smith's retained its own counsel to proceed with the Bell litigation. On
2    August 20, 2012, USF requested Smith's clarify the existence of a current agreement
3    that addresses the accident at issue in the Bell litigation.

4    **C.    This Lawsuit**

5    USF filed this declaratory judgment action on September 3, 2010, seeking a
6    declaration that USF was not obligated to represent and indemnify Smith's. On
7    September 23, 2010, Smith's answered USF's Complaint and brought various
8    counterclaims against USF. Along with its counterclaims, Smith's disclosed the
9    confidential report and valuation of the Bell litigation made by USF's retained attorney,
10   John Shannon, and attached a copy of this report to the pleadings. (See dkt. no. 6-E
11   and 6-L.) USF alleges that plaintiff's counsel in the Bell litigation read the disclosed
12   report, which eventually delayed and increased the value of settlement. The Bell
13   litigation ultimately settled against both J&I and Smith's, with USF agreeing to pay $1
14   million on behalf of J&I and Smith's agreeing to pay $2 million. (Dkt. no. 63-1 at ¶ 11.)

15   USF brings a Motion for Summary Judgment on Smith's counterclaims, as well as
16   a Motion for Partial Summary Judgment on its declaratory relief causes of action. (Dkt.
17   nos. 61 and 63.) Smith's opposed these motions, and later filed a competing Motion for
18   Summary Judgment seeking judgment on its counterclaims. (Dkt. no. 84.)

19   **III.   STANDARD OF REVIEW**

20   The purpose of summary judgment is to avoid unnecessary trials when there is no
21   dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18
22   F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings,
23   the discovery and disclosure materials on file, and any affidavits "show there is no
24   genuine issue as to any material fact and that the movant is entitled to judgment as a
25   matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine"
26   if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for
27   the nonmoving party and a dispute is "material" if it could affect the outcome of the suit
28   under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

Although motions for partial summary judgment are common, Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not contain an explicit procedure entitled "partial summary judgment." As with a motion under Rule

56(c), partial summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb.1992) (citations omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV. DISCUSSION

USF and Smith's bring competing motions seeking judgment on USF's declaratory judgment claim as well as Smith's' declaratory relief counterclaim, insurance bad faith counterclaim, equitable estoppel counterclaim, and request for punitive damages. For ease of analysis, the Court will address first the alleged violations of USF's duties to defend and indemnify Smith's, then turn to USF's duty of good faith and fair dealing. This section concludes with an analysis of USF's affirmative defenses, and Smith's' request for punitive damages.[1]

### A. Duty to Defend and Indemnify

#### 1. Legal Standard

"Nevada has long recognized the special relationship between the insurer and its insured." *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 700 (Nev. 1998). That relationship is one of "special confidence," *Ainsworth v. Combined Ins. Co. of Am.*, 763

---

[1]In its Reply filed in support of its Motion for Summary Judgment, Smith's introduced new evidence relating to USF's Chairman, and made new arguments based on that evidence for the first time. (*See* dkt. no. 96 at 8-11.) Because Smith's improperly introduced new evidence in a reply, the Court declines to review this evidence. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

1   P.2d 673, 676 (Nev. 1988), and is similar to that between a fiduciary and a client, *see*

2   *Powers*, 962 P.2d at 701.  The Nevada Supreme Court has recognized that an insurer

3   owes a duty of good faith and fair dealing to its insured, in addition to a fiduciary-like

4   responsibility that is "part of the duty of good faith and fair dealing." *Id.*

5       Among the obligations of an insurer to its insured are the duty to defend and the

6   duty to indemnify. *Miller*, 212 P.3d at324.  The duty to defend is broader than the duty to

7   indemnify, since indemnification requires that the insured's actions and resulting loss

8   actually fall within the policy's coverage while the duty to defend is triggered when the

9   insured's actions and loss are *potentially* within the policy's coverage.  *Id.*; *see United*

10  *Nat'l Ins. Co. v. Frontier Ins. Co., Inc.*, 99 P.3d 1153, 1158 (Nev. 2004) (noting that while

11  "[t]here is no duty to defend where there is no potential for coverage," an insurer must

12  defend the insured where there is a potential of liability under the policy).  "If there is any

13  doubt about where the duty to defend arises, this doubt must be resolved in favor of the

14  insured." *Id.* (citing *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 350 (9th

15  Cir.1988)).

16      The duty to defend in turn creates a duty of good faith and fair dealing during

17  negotiations, since the insurer has a right to control the settlement discussions.  *Miller*,

18  212 P.3d 318, 324-25.  Likewise, the insurer's right to control litigation creates a duty to

19  defend the insured from lawsuits within the insurance policy's coverage.  *Id.* at 325.

20          **2.    Analysis**

21      USF violated its duty to defend and indemnify Smith's, even though USF entered

22  into an insurance contract only with J&I.  To begin with, J&I and Smith's entered into a

23  Maintenance Agreement wherein J&I agreed to "defend, indemnify, and hold [Smith's]

24  . . . harmless from all claims, demands, losses, expenses and liability . . . for any bodily

25  injury, sickness, disease, death, or damage to or destruction of property . . . arising out

26  of or resulting from the performance of [J&I's] work or any of its employees or

27  subcontractors, even if the loss was partially caused by the negligence of [Smith's]."

28  ///

1    (Dkt. no. 68-B at ¶ 8.)  The Agreement did not require that J&I formally accept Smith's

2    tender of any liability; this obligation flowed automatically from the Agreement.

3          Based on the indemnification clause in the Maintenance Agreement, the terms of

4    the Policy required USF to indemnify Smith's.  Specifically, the Policy provided that USF

5    "will pay those sums that the insured [J&I] becomes legally obligated to pay as damages

6    because of 'bodily injury' or 'property damages' to which this insurance applies" and that

7    USF "will have the right and duty to defend the insured against any 'suit' seeking those

8    damages."  (Dkt. no. 84-C at 40.)  The Policy also applied to liability assumed in an

9    "insured contract" entered into by J&I to assume a third party's liability for bodily injury.

10   (*Id.* at 41.)  The Policy defined an "insured contract" as including "[t]hat part of any other

11   contract or agreement pertaining to your business . . . under which you assume the tort

12   liability of another party to pay for 'bodily injury' or 'property damage' to a third person or

13   organization."  (*Id.* at 52.)  Based on the plain language of the Policy, the Maintenance

14   Agreement qualified as an "insured contract" because it required J&I to assume Smith's

15   tort liability.  *See McDaniel v. Sierra Health and Life Ins. Co., Inc.*, 53 P.3d 904, 906

16   (Nev. 2002) (noting that insurance policies are to be construed "from the viewpoint of

17   one not trained in law or insurance, giving the terms their plain, ordinary, and popular

18   meaning").  Consequently, the Policy covered liability assumed by J&I through the

19   Maintenance Agreement.  As a result, Smith's has standing to pursue claims premised

20   on USF's duty to defend and indemnify, even though Smith's lacked an express

21   contractual relationship with USF.  *See Bergerud v. Progressive Cas. Ins.*, 453 F. Supp.

22   2d 1241, 1249 (D. Nev. 2006) ("When an insurer defines a non-contracting party as

23   'insured,' it makes a contractual agreement to offer benefits to each person fitting within

24   that definition.").[2]

25   _____

26         [2]USF cites *Insurance Co. of North America v. Hilton Hotels USA, Inc.*, 908 F.
     Supp. 809, 814 n.2 (D. Nev. 1995) for the proposition that an insurer is under no
27   obligation to defend an entity not an insured under the insurer's policy.  This rule is
     inapplicable here, since the Policy designates Smith's as an insured.  As a result, USF
28   owes a duty to defend its insured in an action against the insured.  *See Rockwood Ins.*
     *Co. v. Federated Capital Corp.*, 694 F. Supp. 772, 776 (D. Nev. 1988) ("The insurer must
     *(fn. cont…)*

9

1   The supplemental payments provision in the Policy also required that USF defend

2   Smith's.  It provided that "[i]f we defend an insured against a 'suit' and an indemnitee of

3   the insured is also named as party to the 'suit', we will defend that indemnitee" if a

4   number of conditions are met.  (Dkt. no. 84-C at 47.)  These conditions included that the

5   suit against the indemnitee seeks damages for which the insured has assumed liability

6   under an 'insured contract'; the Policy covers the suit; the obligation to defend the

7   indemnitee is included in the 'insured contract'; the allegations in the 'suit' are such that

8   no conflict appears to exist between the insured and the indemnitee; the insured and the

9   indemnity ask USF to control the defense of the suit; the same counsel represents both

10  the insured and the indemnitee; and that written authorization of USF's representation is

11  provided to USF.  (Id.)  J&I's contractual agreement to indemnify Smith's for damages in

12  the Bell litigation triggered USF's obligation to defend Smith's as an indemnitee of J&I.

13  Indeed, in her deposition, Ms. Rock admitted the conditions required to trigger USF's

14  representation of Smith's as an indemnitee existed during the life of the representation.[3]

15  (Dkt. no. 73-O at 132:13-22.)  That J&I did not formally agree to defend and indemnify

16  Smith's is irrelevant to whether these duties attached to USF, since the Maintenance

17  Agreement *required* J&I to defend and indemnify Smith's.  USF's citation to *York*

18  *International Group v. Cincinnati Ins. Co.*, No. 06-4778, 2007 WL 2667984, at *7-8 (E.D.

19  Pa. Sep. 5, 2007), which held that an insurance contract does not confer third-party

20  beneficiary status to contractual indemnitees, is inapposite.  *York International* relied

21  _____

*(fn. cont.)*

22  defend any lawsuit brought against its insured which potentially seeks damages within
the coverage of the policy.").

23      [3]Notwithstanding the admission of its claims officer, USF erroneously argues that

24  Smith's' demand for separate counsel destroyed the conditions for USF's representation
of Smith's. First, the Policy designated Smith's as an insured regardless of the

25  supplementary payments section.  Second, USF may have been under an obligation to
provide its insured with independent counsel when a conflict with Smith's arose.  *See*

26  *Hansen v. State Farm Mut. Auto Ins. Co.*, No. 2:10-cv-1434-MMD-RJJ, 2012 WL
6205722, at *8-9 (D. Nev. Dec. 12, 2012) (interpreting Nevada law to adopt requirement

27  that insurers must provide independent counsel to insureds when conflict arises, per *San
Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 162 Cal. App. 3d 358, 364

28  (1984)).

10

1    both on contrary state law inapplicable to this Nevada litigation as well as the simple fact

2    that the third parties were held not to be additional insureds under the policy at issue.

3    In addition to — and because of — the terms of the Policy requiring USF to insure

4    Smith's, USF defended Smith's in the Bell litigation.  Even independent of Smith's' status

5    as an additional insured under the Policy, once USF assumed the defense, it established

6    a contractual relationship that obligated it to act in good faith and deal fairly with Smith's.

7    *See United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (Nev. 2004) (noting

8    that once the duty to defend arises, the insurer's duty continues throughout the entire

9    litigation).  Indeed, USF acted as an insurer of Smith's by asserting the right to defend

10   Smith's during settlement negotiations, making an offer on Smith's behalf during those

11   negotiations, referring to Smith's as an insured in numerous communications, and

12   refusing Smith's' demand for separate counsel when conflicts arose.

13   Lastly, USF did not accept Smith's defense with a reservation of rights.  It did not

14   challenge J&I's obligation to defend Smith's, and did not reserve the right to recover from

15   Smith's should it later determine that it was under no obligation to enter into the

16   representation.  Although USF may have accepted J&I's defense with a reservation of

17   rights, that fact does not have any bearing on its independent representation of Smith's.

18   Consequently, Smith's has standing to assert waiver because of its status as USF's

19   insured.  Indeed, numerous references in the record demonstrate USF's characterization

20   of Smith's as an "additional insured."  That USF did not reserve its right to challenge its

21   obligation to defend Smith's provides additional support for the Court's decision.

22   Indeed, a perverse result would follow from the Court holding otherwise.  USF

23   seeks a rule that allows an insurer to extricate itself from representing a third party after

24   it incorrectly assumed that it was under an obligation to do so, even when the insurer did

25   not reserve its rights. In effect, USF's rule places the burden on the third party

26   beneficiary to interpret the insurer's actions and the insurer's policy in order to assure

27   itself that the insurer will not abandon its duties mid-course.  The more reasonable rule —

28   and the rule most in line with Nevada law — would require the insurer to carry the burden

of determining whether the underlying facts exist for it to assume the duty to represent a third party.  USF's rule would abdicate an insurer's responsibility of due diligence, and would saddle clients represented with counsel retained by insurance companies with unnecessary uncertainty.  Contrary to USF's position, the law is not so forgiving.

Smith's has demonstrated as a matter of law that USF had a duty to defend and indemnify Smith's in the Bell litigation, and succeeds in its request for declaratory judgment accordingly.

### B.    Bad Faith Insurance Claim

#### 1.    Legal Standard

An insurer's bad faith in handling a claim against an insured is actionable as a breach of the implied covenant of good faith and fair dealing between the insurer and the insured.  "Where an insurer fails to deal fairly and in good faith with its insured by refusing without proper cause to compensate its insured for a loss covered by the policy such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing."  *U.S. Fidelity & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975).  Put differently, bad faith exists where there is an "actual or implied awareness of the absence of a reasonable basis for denying benefits of the insurance policy."  *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009) (quoting *Am. Excess Ins. Co. v. MGM*, 729 P.2d 1352, 1354-55 (Nev. 1986)).  Poor judgment or negligence on the part of an insurer does not amount to bad faith.  *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 995 (9th Cir. 2001) (stating California law).  This duty of good faith arises by law irrespective of the insurance contract's terms, and flows from Nevada law's recognition of an implied covenant of good faith and fair dealing in every contract.  *Id.*; *see Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 382 (Nev. 1993).  The existence of an insurer's bad faith is a matter of fact to be decided by the jury.  *Allstate Ins. Co.*, 212 P.3d at 327 (citing with approval *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 489 (9th Cir. 1981) (discussing California law)).

///

1        **2.     Analysis**

2        A genuine issue of material facts exists as to whether USF failed to act in good

3    faith toward its client, Smith's.  Upon initiating its representation of Smith's, USF failed to

4    respond to settlement offers from Ms. Bell's counsel in November and December 2008.

5    This failure to respond disturbed both Smith's counsel and USF's retained attorney, both

6    of whom urged USF to accept the offer.   USF refused, and proceeded to reject

7    settlement offers within policy limits during the period between 2008 and 2011.

8        Smith's argues that USF's failure to accept the Offer constituted bad faith in light

9    of Mr. Busby's and Mr. Shannon's recommendations to do so.   Smith's has not

10   demonstrated as a matter of law that USF acted against clear evidence demonstrating

11   both Smith's and J&I's liability as well as evidence supporting a higher damages

12   valuation.   In his July 2, 2008, letter, Mr. Shannon determined that J&I was solely

13   responsible for Ms. Bell's injuries, but refused to conclusively provide a figure for her

14   damages.   As of December 22, 2008, Mr. Shannon determined that the potential for

15   damages exposure favored accepting the Offer.  (Dkt. no. 68-I.)  This determination was

16   based on new records revealed since the July 2 report.

17       In a November 2009 letter, USF justified its decision not to accept the Offer and to

18   offer only $100,000 during mediation by claiming that it had not received all of the

19   relevant medical information, that it's retained expert expressed doubt as to the cause of

20   Ms. Bell's medical damages, and that Ms. Bell might be exaggerating her claims during

21   the litigation.  (Dkt. no. 68-L.)  This response raises questions as to whether USF acted

22   appropriately, questions that the Court is unwilling to rule on as a matter of law.

23   Although USF should have recognized that J&I was solely responsible for Ms. Bell's

24   injuries, an issue of fact remains as to whether it was reasonable for USF to reject the

25   Offer and only offer $100,000 to settle the claim.   Since Mr. Shannon appears not to

26   have conclusively determined whether or not Ms. Bell's medical damages were related

27   to any preexisting conditions, and since USF relied on the opinion of an expert who

28   questioned the cause of Ms. Bell's expenses, USF has raised triable issue of fact.  It is

1    the province of the jury, not the Court, to weigh the credibility and value of the

2    information available to USF during this period.  *See Allen*, 656 F.2d at 489 (noting that

3    because what is good faith and bad faith "has not yet proved susceptible to pat legal

4    definition, an insurer's 'good faith' is essentially a matter of fact.").

5         The Court notes that Mr. Shannon's March 2010 evaluation of liability and $6 to

6    $10 million valuation of damages does not conclusively establish USF's bad faith in the

7    period between December 2008 and April 2009.  This evaluation of both damages and

8    liability may have been based on facts unavailable to USF during this time period, and

9    may involve a factual determination minimizing the relevance of USF's retained expert.

10        Smith's also argues that USF acted in bad faith when it failed to communicate to

11   Smith's the Offer made by Ms. Bell's attorney during the ten-day acceptance period.

12   *See Miller*, 212 P.3d at 325 ("A primary insurer's right and duty to defend attaches when

13   the insured tenders defense of the lawsuit to the insurer and carries with it the duty to

14   communicate to the insured any reasonable settlement offer that could affect the

15   insured's interest.").  Failure to communicate a settlement offer may, on its own, give rise

16   to an insurance bad faith claim.  *Id.* at 327 (holding that a "failure-to-inform theory is a

17   viable basis for bad faith by itself").  As liability on a failure-to-inform theory depends on

18   weighing a number of different fact-specific factors, *see id.* at 326-27 (surveying law from

19   different jurisdictions, and ultimately submitting issue to jury), the jury is best positioned

20   to determine whether USF's failure to inform constituted bad faith on its own.

21        Lastly, USF refused Smith's' various demands for independent counsel in the face

22   of a conspicuous conflict between itself and Smith's over the Bell litigation.  No dispute of

23   fact exists over whether or not a denial of independent counsel occurred, or whether

24   such a denial was reasonable or not.  In its letters to Smith's, USF made clear that its

25   refusal to provide independent counsel was based on the Policy's term that prohibits the

26   insured from selecting its own counsel.  (*See* dkt. nos. 64-L ("Smith's is bound by the

27   terms and conditions of this policy, which does not permit the insured to select defense

28   counsel of their choice.") and 84-M.)   To the extent that this term governed USF's

obligations to Smith's, it cannot swallow the principle that the insurer's duty to defend its insured recognizes its obligation to pay for independent counsel when a conflict emerges. *See Hansen*, 2012 WL 6205722, at *8-9 (relying on *Nev. Yellow Cab Corp. v. Eighth Judicial Distr. Court ex rel. Cnty. of Clark*, 152 P.3d 737, 741-42 (Nev. 2007)). Whether failure to adhere to this obligation constituted bad faith, however, is a question best poised for the jury. If USF was merely ignorant of this requirement, or acted negligently in failing to adhere to it, no bad faith existed. However, if USF's conduct in denying Smith's independent counsel was the result of intentional bad faith conduct, USF may be liable irrespective of its other conduct.

In sum, material questions of fact remain as to whether USF failed to "adequately protect the insured's interest," and as a result is liable for a bad faith insurance violation. *See Miller*, 212 P.3d at 326 (stating that insured must at minimum "equally consider the insured's interests and its own"). Given the fact-intensive nature of such a determination, the Court denies both parties' requests for summary judgment on Smith's' bad faith counterclaim.

### C.   Equitable estoppel

#### 1.   Legal Standard

The doctrine of equitable estoppel "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Strong v. Cnty. of Santa Cruz*, 543 P.2d 264, 266 (Cal. 1975) *cited with approval in Cheqer, Inc. v. Painters and Decorators Joint Comm., Inc.*, 655 P.2d 996, 998-99 (Nev. 1982)). Unlike many jurisdictions, Nevada does not limit equitable estoppel to an affirmative defense. *See Mahban v. MGM Grand Hotels, Inc.*, 691 P.2d 421, 424 (Nev. 1984). In order to establish equitable estoppel, "(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied

to his detriment on the conduct of the party to be estopped." *In re Harrison Living Trust*, 112 P.3d 1058, 1062 (Nev. 2005).

### 2. Analysis

Smith's has demonstrated the requirements for its equitable estoppel counterclaim against USF. At bottom, USF led Smith's into believing that it would defend and indemnify Smith's without reservation, and subsequently filed this declaratory action seeking a court proclamation that Smith's was not entitled to this representation. USF argues that it was not apprised of all the facts in this case, since it believed that J&I had accepted Smith's tender. But as explained above, whether or not J&I accepted Smith's tender is irrelevant to whether USF entered into a contract that obligated it to represent Smith's. Put differently, the "true state of facts" that USF must be ignorant of do not include J&I's formal acceptance of Smith's tender. Accordingly, Smith's succeeds as a matter of law on its equitable estoppel counterclaim.[4]

### D. Affirmative defenses

USF asserts two affirmative defenses in its Opposition to Smith's' Motion for Summary Judgment: unclean hands and equitable estoppel.

### 1. Unclean hands

"The unclean hands doctrine generally 'bars a party from receiving equitable relief because of that party's own inequitable conduct.'" *Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764, 766 (Nev. 2008) (quoting *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000)). USF asserts this defense to all claims.[5] In particular, USF argues that the disclosure of

---

[4]Success on this counterclaim does not entitle Smith's to any remedies beyond that which it seeks in its insurance bad faith claim. While Smith's styled its invocation of equitable estoppel as a counterclaim, it invokes estoppel as a quasi-defense to USF's declaratory judgment request. *See Mahban*, 691 P.2d at 424.

[5]While it may be likely that an unclean hands defense can be invoked even when only a remedy at law is sought despite the doctrine's historical roots in courts of equity, the Court's review of Nevada law did not reveal any decision addressing this issue. Other states have extended the doctrine to apply to remedies at law. *See, e.g.*, *Camp v. Jeffer, Mangels, Butler & Marmaro*, 65 Cal. App. 4th 620, 638 (Cal. Ct. App. 1995) ("In *(fn. cont…)*

1   confidential attorney reports by Smith's in pursuit of its counterclaim bars it from seeking

2   recovery for a bad faith insurance claim.  The Court agrees that the disclosure of the

3   reports was improper.  Smith's responds to the charge by arguing that USF's misconduct

4   was the driving force behind the challenged disclosures, and that the compulsory

5   counterclaim rule mandated the disclosures.  Both arguments fail.

6        First, a party asserting an unclean hands defense necessarily stands accused of

7   some illegality.  It is no retort to disclaim one's unclean hands by pointing to the original

8   illegality as the cause for one's own misconduct.  Indeed, the doctrine of unclean hands

9   is an affirmative defense levied regardless of whether the asserting party is liable for the

10  underlying violation.

11       Second, the question of whether the Federal Rules of Civil Procedure compelled

12  Smith's to file a counterclaim is independent of whether Smith's ought to have disclosed

13  potentially confidential information during the pendency of the Bell litigation.  Here, the

14  insurer (USF) and the insured (Smith's) are joint clients represented by retained counsel

15  (John Shannon).  *See Nev. Yellow Cab Corp.*, 152 P.3d at 741-42 (adopting majority

16  rule that "counsel represents both the insured and the insurer").  "Each of the joint clients

17  holds the privilege protecting their confidential communications with the attorney; one

18  client may not waive the privilege without the consent of the other."  *Roush v. Seagate*

19  *Tech.*, *LLC*, 150 Cal. App. 4th 210, 223 (Cal. Ct. App. 2007); *see also Am. Mut. Liab.*

20  *Ins. Co. v. Superior Court*, 38 Cal. App. 3d 579, 590-96 (Cal. Ct. App. 1974) (holding that

21  when one client has waived the privilege, the joint clients' attorney cannot waive that

22  privilege for the other).  While the documents may not be privileged as between Smith's

23  and USF, *see Glacier Gen. Assurance Co. v. Superior Court*, 95 Cal. App. 3d 836, 842

24  _____

25  *(fn. cont.)*
    California, the doctrine of unclean hands may apply to legal as well as equitable claims
26  and to both tort and contract remedies."); *Maldonado v. Ford Motor Co.*, 719 N.W. 2d
    809, 818 (Mich.  2006) ("The authority to dismiss a lawsuit for litigant misconduct is a
27  creature of the 'clean hands doctrine' and, despite its origins, is applicable to both
    equitable and legal damage claims.").  As the parties have not briefed the issue, the
28  Court declines to entertain the question until such a determination becomes necessary.

1   (1979) (holding that an insurer cannot invoke attorney-client privilege to shield the

2   insured from introducing otherwise protected information central to the insured's bad

3   faith claim against the insurer), that privilege remains as to strangers to the attorney-

4   client relationship.  *See, e.g.*, *Nowell v. Superior Court for Los Angeles Cnty.*, 223 Cal.

5   App. 2d 652, 657 n.4 (1963) ("Where two or more persons engage an attorney to

6   represent all of them, the privilege is waived as between the parties, but it remains as to

7   strangers."). Consequently, Smith's was under an obligation to maintain the

8   confidentiality of the documents from strangers. Its failure to do so jeopardized USF's

9   ability to represent Smith's' interest in settlement negotiations.

10         Conspicuously absent from the parties' briefings was a simple choice available to

11   Smith's: requesting court leave to disclose the confidential documents under a protective

12   order.   *See Silva v. Fire Ins. Exch.*, 112 F.R.D. 699, 700 (D. Mont. 1986) (holding that

13   while work product and attorney-client privilege cannot be invoked to the insurance

14   company's benefit in an insurance bad faith claim, the court can "entertain a motion for

15   protective order to preclude the dissemination of particular information" upon a

16   particularized showing of good cause).  Smith's failed to seek leave to file under seal

17   documents it ought to have known would damage USF (and, in turn, Smith's and J&I's)

18   position in the Bell litigation.

19         The remaining question before the Court in evaluating the unclean hands defense

20   is the seriousness of Smith's disclosure and the circumstances that led to the filing of the

21   confidential report without seeking a protective order.  This is admittedly a difficult fact

22   question that the Court is unprepared to resolve on summary judgment.  Smith's does

23   not address USF's contention that the disclosures damaged settlement negotiations in

24   the Bell litigation, while USF argues that Ms. Bell's counsel utilized the confidential

25   reports disclosed in this suit to its advantage during continued settlement negotiations.

26   In a January 2011 letter to counsel for Smith's and J&I, Ms. Bell's counsel referred to Mr.

27   Shannon's confidential valuation of the Bell litigation at between $6 and $10 million, and

28   indicated that he would entertain settlement offers only if they began at $3 million.  (Dkt.

no. 89-D.)  This valuation traces back to a letter Mr. Busby wrote to Sally Rock on May 7, 2010, where he communicated his frustration over USF's $100,000 settlement offer in light of Mr. Shannon's status report where, according to Mr. Busby, "Mr. Shannon gave the opinion that the exposure in this case is between $6 and $10 million."  (Dkt. no. 6-L.)  This letter was filed by Smith's as one of many exhibits appended to its Answer and Counterclaims.  (*See* dkt. no. 6.)  In addition, USF attorney Pamela McKay testified that Mr. Bell's counsel acknowledged reading the disclosed letter.  (Dkt. no. 89-2 at ¶ 7.)  It is unclear from this evidence what impact the disclosure of Mr. Shannon's evaluation had on 2011 settlement discussions.  If the settlement amount ultimately decided on between the parties in the Bell litigation was likely to be approximately $3 million regardless of Smith's' disclosure, this factor of the unclean hands defense would prove fatal to USF.  Moreover, it is not clear to the Court from the evidence presented what benefit, if any, Smith's gained from disclosing the information in the report.  USF has not demonstrated as a matter of law that Smith's seeks judgment with unclean hands, nor has Smith's carried its burden in refuting USF's affirmative defense.  The Court denies both parties' request for summary judgment on this issue.

### 2.     Equitable estoppel

USF also asserts an equitable estoppel defense to the counterclaims, arguing that it would not have entertained the representation of Smith's had it known that J&I had not formally accepted Smith's' tender of defense.  This defense fails for the reasons described above.  Pursuant to the Policy, USF was required to defend and indemnify J&I for suits against Smith's covered by the Maintenance Agreement.  J&I's duty to defend and indemnify Smith's was also not discretionary.

### E.     Punitive damages

Both parties seek summary judgment on Smith's request for punitive damages in its counterclaims.

While punitive damages are generally not rewarded in breach of contract claims, Nevada law provides punitive damages in cases alleging involving an insurer's breach of

the implied covenant of good faith and fair dealing.  *See Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997).  NRS § 42.005(1) provides for punitive damages "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied . . ."  Oppression is in turn defined as "a conscious disregard for the rights of others which constitute[s] an act of subjecting plaintiffs to cruel and unjust hardship."  *Ainsworth*, 763 P.2d at 675.  Nevada law defines malice as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others."  *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252 (Nev. 2008) (citing NRS § 42.005(3)).  Fraud is defined as "an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person."  *Id.* at § 42.005(2).

USF argues that its conduct during the course of the representation was justifiable, including its decision not to settle the litigation within policy limits.  It argues that its failure to settle the litigation during the 2009 mediation was due to Ms. Bell's offer that exceeded USF's policy limits, an offer it argues was unreasonable at the time.  Smith's counters by pointing to USF's general inadequacy in its representation, including its decision not to appoint independent counsel when a conflict arose between J&I and Smith's, and its decision not to settle within policy limits when it knew that J&I was 100% liable for Bell's injuries.  For the same reason underlying the Court's decision not to award judgment to either party on Smith's' bad faith counterclaim, a question of fact exists as to whether USF acted in an oppressive, malicious, or fraudulent way.  It is up to the jury to decide whether, in light of the facts available to USF during the relevant periods, USF acted with sufficient malice to be liable for punitive damages.  Accordingly, both parties' summary judgment requests with respect to punitive damages are denied.

///

V.    **CONCLUSION**

In summary, the record demonstrates USF owed a contractual duty to defend and indemnify Smith's in the underlying Bell litigation. J&I was required to defend and indemnify Smith's in the underlying action, and Smith's qualified as an insured under the Policy.  Consequently, USF was obligated to defend and indemnify Smith's in the Bell's litigation.  This duty included an obligation to retain, at its expense, independent counsel for Smith's when a conflict of interest arose.

However, a genuine issue of material fact exists as to whether USF acted in bad faith and whether Smith's engaged in unclean hands by filing the confidential attorney report.  The question of whether punitive damages should be awarded in light of USF's misconduct is also one for the jury to decide, as material questions of fact preclude a ruling as a matter of law.

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff USF Insurance Company's Motion for Summary Judgment (dkt. no. 61) is DENIED.

IT IS FURTHER ORDERED that USF's Motion for Partial Summary Judgment (dkt. no. 63) is DENIED.

IT IS FURTHER ORDERED that Smith's Food and Drug Center, Inc.'s Motion for Summary Judgment (dkt. no. 84) is GRANTED in part and DENIED in part, as outlined herein.

DATED THIS 4th day of February 2013.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE